**WESTINGHOUSE ELECTRIC CORPORATION, Appellant,**

v.

**The UNITED STATES, Appellee.**

**Appeal No. 85–2200.**

United States Court of Appeals, Federal Circuit.

Feb. 3, 1986.

David V. Anthony, Pettit & Martin, Washington, D.C., argued for appellant. With him on brief were Thomas C. Wheeler and Joseph K. Wiener.

George M. Beasley, III, Senior Trial Atty., Commercial Litigation Branch, Dept. of Justice, Washington, D.C., argued for appellee. With him on brief were Richard K. Willard, Acting Asst. Atty. Gen. and David M. Cohen, Director. Richard L. Hanson, Senior Trial Atty., Office of the Chief Trial Atty., Air Force Contract Law Center, Ohio, of counsel.

Before RICH, DAVIS and NEWMAN, Circuit Judges.

DAVIS, Circuit Judge.

This case, coming to us from the Armed Services Board of Contract Appeals (ASBCA or Board), presents the legal issue of whether a special progress payment clause, promulgated for future contracts by the Department of Defense to deal with a particular situation, is reasonable and lawful. The problem has a complex background with which the ASBCA dealt extensively in its opinion. *Westinghouse Electric Corp.*, 85–1 B.C.A. ¶ 17,910 (1985). Without again sketching or repeating the specifics of that discussion, we consider the legal question before us, and affirm.

## I.

Our problem is a result of the historical fact that, prior to 1976, there were two accepted methods commonly used by government contractors to allocate their general and administrative (G & A) expenses to their government contracts. One was the "cost of sales" (or output) method under which G & A costs were keyed, in general, to actual deliveries; the other was the "cost incurred" (or input) method in which G & A costs were hinged to the total costs incurred during the appropriate period, irrespective of whether those costs were attributable to delivered items or to undelivered items (*i.e.,* work-in-process inventory).

To standardize cost measurement and allocation for certain aspects of government procurement, Congress established (in 1970) the Cost Accounting Standards Board (CASB). In April 1976, the CASB promulgated Cost Accounting Standard 410 (CAS 410) which required G & A expenses to be allocated to Government contracts by the cost input method. However, an optional transition method permitted all existing (*i.e.,* pre-CAS 410) contracts to continue to allocate G & A expense by the output method (if that had been the measure used) until those contracts were completed. At the same time, CAS 410 required contractors electing this transition option to establish an inventory suspense account equal to the beginning inventory of those contracts covered by CAS 410 as of the effective date of CAS 410 for that contractor.[1]

The current case involves one contract of one segment of appellant Westinghouse Electric Corporation (Westinghouse), its Defense and Electronics Systems Center. That portion of Westinghouse had always used the cost of sales (output) method in allocating its G & A expenses to its Government contracts. After the promulgation of CAS 410, *supra,* Westinghouse's Defense Center elected to use the optional transition method of CAS 410 and twice refused the alternative of negotiating an equitable adjustment (fn. 1, *supra*).

In 1977, in reaction to that transition method, the Department of Defense proposed a change, not in the allocation of costs for contract pricing or reimbursement, but in cost allocation for the purposes of progress payments on Defense contracts, *i.e.,* a change in one channel for financing Government contracts. This proposal added a new paragraph to the portion of the Armed Forces Procurement Regulations (AFPR) dealing with such progress payments:

> For those contractors who elected to use the special transition method provided in Cost Accounting Standard (CAS) 410, "Allocation of Business Unit General and Administrative Expenses to Final Cost Objectives," General and Administrative (G & A) shall not be included in incurred costs eligible for progress payments until the work-in-process inventories of those contracts entered into after the applicability date of CAS 410 exceed the amounts contained in the CAS 410 suspense account and then limited to this contractor's pro rata share of the G & A allocable to such excess. This limitation shall not apply where the CAS 410 suspense account is less than 5 million dollars.

This revised progress payment provision was to be effective on Defense contracts awarded after March 31, 1978.

Westinghouse considered this special clause to be invalid and has litigated that issue via a particular new contract of its Defense and Electronics Systems Center which contained the challenged progress payments clause. This contract was effective August 11, 1978, and was made with the Department of the Air Force, Warner Robins Air Logistics Center. Westinghouse sought from the contracting officer

---

1. The suspense account would last until the contractor stopped doing business with the Government or moved wholly to cost reimbursement business. At that time, the remainder of the suspense account would have to be liquidated.

A contractor eligible for the transition method could also elect, as an alternative to that method, to negotiate equitable adjustments with the Government to account for any "overallocation" of G & A costs under its old method.

a decision that it was entitled to progress payments on that contract under the formula of the pre-CAS 410 Defense progress payment clause (the 1974 progress payment clause) rather than the new 1978 progress payment clause (which was incorporated into the contract). When the contracting officer failed to give a decision, Westinghouse appealed to the ASBCA. The latter took jurisdiction, decided the merits, and held that the 1978 progress payments clause was valid.[2]

## II.

It is most significant for this case that the ASBCA found as a fact, on the basis of substantial evidence, that the establishment of CAS 410's transition method "could result in some contractors receiving more cash flow with respect to G & A because payments and reimbursements during each transition period would include amounts for G & A expenses in excess of expenses actually incurred. This situation * * * would apply only to contractors who elected to use the transition method * * *. During each CAS 410 transition period when WIP [work-in-progress] inventories were rising, over-recoveries, through higher reimbursements under cost type contracts and through higher final prices on flexibly priced contracts, would be received by all transition method contractors." *Westinghouse Electric Corp.*, 85–1 B.C.A. at 89,685.[3] It is in the light of this crucial fact that we must assess the validity of the special progress payments clause before us.

■ And because this appeal centers on a contractual provision for progress payments, we base our legal analysis on the statutory postulate that the Defense Department has been given the authority, within defined limits, to provide such payments to its contractors. 10 U.S.C. § 2307(c) states that the "head of any agency [Army, Navy, Air Force] may—(1) make advance, partial, progress, or other payments made under contracts for property or services made by the agency * * *." That legislation expressly grants the power to the Defense Department to provide for progress payments as part of *contract financing.* In contrast, the promulgation of cost accounting standards (like CAS 410) was given to another agency, the CASB, in Pub.L. 91–379 (August 15, 1970), and those standards were to govern federal agencies in the separate area of "estimating, accumulating, and reporting *costs in connection with pricing, administration and settlement* of" designated federal contracts (emphasis added). The ASBCA recognized and adhered to this distinction—as we must also do.

Of course, Defense's own financing authority under 10 U.S.C. § 2307 cannot violate another binding provision of law or regulation, whether within § 2307 itself or outside—and, similarly, Defense's exercise of power under § 2307, *supra,* cannot be arbitrary or capricious. But the important point here is that the Defense Department has its own, independent authority to include proper progress payment clauses in its contracts and to deal with the financing of those contracts. That power exists independently and is not drawn from the statute creating and implementing the CASB, though exercise of that power may conceivably be defeated or modified by a particular cost accounting standard.

## III.

■ Appellant's major contention is that the new progress payment clause illegally

---

2. The Government no longer argues that the ASBCA lacked jurisdiction or that Westinghouse has no right to challenge that clause since it had accepted the contract containing the clause. Nor does appellant challenge the ASBCA holding that the new progress payments clause was agreed to form a part of the contract at issue.

3. Similarly, the Board properly found: "It is universally agreed that the transition method produces an 'over-allocation' of G & A expenses to total cost objectives for any accounting period in which any pre-410 contracts are being performed. In any 'transition period' more than 100% of the total G & A expense pool for the period will be allocated to final cost objectives (including both pre-410 and post-410 contracts) for the period." *Id.* at 89,681.

trenched on the authority in CAS 410 for contractors like Westinghouse to adopt the transition method. That point simply cannot be accepted. CAS 410 solely concerns contract prices, while the progress payment provision, which is at issue here, deals with the separate matter of financing of post-CAS 410 contracts—not with payment for deliveries made (past or future) or reimbursement of costs incurred (past or future). This sharp difference in subject matter and in impact was the gist of the testimony before the ASBCA, and grounded its holding. That same difference was recognized informally by the CASB in its consideration of CAS 410. As we have also pointed out *supra* in Part II, the distinction between contract costs and contract financing has been recognized by Congress.

■ Nor was the new progress payments clause a "penalty" imposed by Defense on those contractors choosing the transition method in an attempt to recoup payments made by the Government under prior contracts. Both these arguments founder on (a) the ASBCA's factual findings plus (b) the separate source and nature of the Defense power with respect to progress payments. The Board explicitly found that the objective of the new Defense progress payment policy was to "correct" the unbalanced situation produced by the CAS 410 transition method as described in the ASBCA finding quoted *supra* in Part II. That finding is amply sustained by the evidence[4] and is not undermined by anything now cited by appellant. True, many in the Air Force would have preferred mandatory equitable adjustment for all affected continuing contracts—in lieu of the transition method adopted in CAS 410—but the ASBCA could very properly view the entire record as failing to support any effort by Defense either to "punish" users of the transition method or unlawfully to "take back" payments already made under pre-CAS 410 contracts. Recognizing as we

must that Defense had its own discretionary authority over contract financing (including progress payments), we cannot overturn ASBCA's factual determinations that Defense took account for its own proper purposes of the effects of CAS 410, but did not try to invade the province of the CASB and of its CAS 410. *See* Part IV, *infra.*

### IV.

■ Westinghouse denies, in any event, that there was a rational basis for the adoption of the Defense regulation calling for the new progress payment provision. The Board did not agree and neither can we. Because of the over-allocation of G & A expenses by transition method contractors (see the findings by the ASBCA, Part II, *supra*) the Defense Department believed that those contractors needed less financing while they were utilizing the transition method—there was an increase in cash flow inuring to such contractors which decreased their need for immediate financing. The Board found that belief to be reasonable, and also that it was appropriate, practical, and reasonable to handle the problem of offsetting the increased cash flow through a modification in progress payments.[5] Because Congress has given the discretion with respect to contract financing to the Defense Department, we must concur with those conclusions. As the Board observed, the agency's solution may be imprecise (and possibly even lead to some inequities in particular cases) but that is not a sufficient basis for a general overturning of the reasonable choice Defense made.

Westinghouse says that the administrative choice was irrational and discriminatory because the progress payment clause governs only post-CAS 410 fixed-price con-

---

4. In particular there is substantial evidence that the CASB itself took the view, informally, that the Defense Department could correct (through its power over financing) the over-allocation in costs caused by CAS 410's transition period.

5. The Board specifically found that Westinghouse's experience (described summarily in fn. 6, *infra*) was not unique among major defense contractors.

tracts while the Board found here that the over-allocations would occur in cost-type and flexibly-priced contracts. For this case it is an adequate answer to this complaint that (a) Westinghouse had very significant cost-reimbursement and flexibly-priced business during the transition period [6] and (b) the new progress payment clause applies to flexibly-priced contracts as well as to firm fixed-price agreements. In this case, at the least, there is no discrimination and no irrationality.

*Affirmed.*

6. The ASBCA found that "in all years after 1977, Westinghouse experienced consistently rising work in process inventories and that its experience was not unique among defense contractors. * * * We have also found that, during each transition period where work in process inventories are rising, the over-allocation of G & A expenses inherent in the transition method will result in over-recoveries under pre–410 cost-type and flexibly priced contracts." *Westinghouse Electric Corp.,* 85–1 B.C.A. at 89,696.